---

## PEOPLE v. SHANLEY.

(Supreme Court, Appellate Division, First Department. June 18, 1909.)

1. PRINCIPAL AND AGENT (§ 97*)—AUTHORITY UNDER POWER OF ATTORNEY—EXECUTION OF MORTGAGE SATISFACTION.

A power of attorney authorizing defendant to receive all "moneys, stocks, bonds, bonds and mortgages, or other certificates of indebtedness that may now or hereafter be directed to be paid to me by order of court or otherwise, and that may now or hereafter be placed to my credit in the North American Trust Company, * * * and to do and perform with such money, stocks, bonds, mortgages and certificates, any and all acts that I might myself perform and to take any and all steps that he, my attorney, may deem best for the protection of my interests," and authorizing defendant "to sign my name and to make withdrawals and deposits in my place and stead," does not authorize defendant to execute and acknowledge as the personal act of his principal a satisfaction of a mortgage which had been transferred to the principal by the North American Trust Company.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 376; Dec. Dig. § 97.*]

2. FORGERY (§ 44*)—EVIDENCE.

Evidence, in a prosecution for forgery, *held* to establish a prima facie case of forgery so as to throw the burden of explanation on defendant.

[Ed. Note.—For other cases, see Forgery, Cent. Dig. §§ 117–121; Dec. Dig. § 44.*]

3. FORGERY (§.47*)—QUESTIONS FOR JURY.

In a prosecution for forgery, it was a question of fact under the evidence whether defendant acted under a power of attorney that had been given him, irrespective of whether the power of attorney authorized the execution and delivery of the instrument alleged to have been forged.

[Ed. Note.—For other cases, see Forgery, Cent. Dig. § 123; Dec. Dig. § 47.*]

4. FORGERY (§ 9*)—ELEMENTS OF OFFENSE.

A mortgage satisfaction, which purports to be executed and acknowledged as the personal act of the person holding the mortgage, but which is executed and acknowledged by another person, is a forgery, as "forgery" is defined as the false making of an instrument which purports to be that which it is not.

[Ed. Note.—For other cases, see Forgery, Cent. Dig. § 16; Dec. Dig. § 9.* For other definitions, see Words and Phrases, vol. 3, pp. 2900–2909; vol. 8, p. 7665.]

5. FORGERY (§ 44*)—EVIDENCE—SUFFICIENCY.

Evidence, in a prosecution for forgery of a satisfaction of a mortgage, *held* sufficient to sustain a conviction.

[Ed. Note.—For other cases, see Forgery, Cent. Dig. §§ 117–121; Dec. Dig. § 44.*]

Appeal from Court of General Sessions, New York County.

Victor Shanley was convicted of forgery, and appeals. Affirmed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Thomas J. O'Neill (J. Brownson Kerr, on the brief), for appellant. William Travers Jerome, Dist. Atty. (Robert C. Taylor, Asst. Dist. Atty., of counsel), for the People.

CLARKE, J. The defendant, who was a member of the bar, was convicted under the second count of the indictment, which charged him with uttering as true a certain forged instrument purporting to be the act of Julia A. Smith, by which certain rights and interests in real property purporting to be transferred, conveyed, and affected, setting out the instrument, a satisfaction of a mortgage, in full, and the indictment proceeded:

"And to which forged instrument there was then and there attached and annexed a certain other instrument in writing which was then and there as follows; that is, to say: 'State of New York, City of New York—ss.: On this 14th day of March, 1904, before me personally came Julia A. Smith, to me known and known to me to be the individual described in and who executed the above certificate, and she thereupon duly acknowledged to me that she had executed the same. George M. Silverberg, Commissioner of Deeds, New York City. [Seal.]' He, the said Victor Shanley, then and there well knowing the said forged instrument and writing to be forged."

Julia A. Smith was a young woman who had been a friend and acquaintance of the defendant for a number of years. She employed him as her attorney. She came into possession of certain papers upon the settlement of her grandfather's estate. Among those papers was a bond and mortgage for $25,000 and the assignments by which title thereto vested in her. The settlement of the estate and the transfer of the papers to her by the North American Trust Company occurred

on the 25th of July, 1903. The defendant procured a safety deposit box in which Miss Smith's securities and papers were placed and of which he kept a key; she not having received one until about a month after the deposit. The bond and mortgage were, by their terms, due and payable May 1, 1904. The Ritter Realty Company owned the freehold, and they had contracted to sell the property. On January 30, 1904, the defendant wrote to said company:

"Miss Smith, the owner of the mortgage upon 14 West 117th street, has concluded not to renew the same. I shall therefore have the proper papers executed and ready for delivery to your representative May 1st, or any other date you may desire."

On February 29th of the same year, he wrote to the attorney for said company:

"I have had an interview with Miss Smith, the holder of the mortgage on the 117th street property, and, as she has made arrangements for reinvestment, she cannot renew as you requested. She also desires me to say that if it will facilitate your sale, she will be pleased to accept payment on the date of closing. If this is agreeable to you, please let me know."

On the 15th of March, 1904, the defendant received $25,000 in discharge of the mortgage and delivered the satisfaction piece with its acknowledgment, set forth in the indictment. He deposited this sum to his own account in his own bank and subsequently spent all of it for his own purposes. He had never had any conversation whatever with Miss Smith in regard to the extension or the payment of the mortgage, and she was entirely unaware that it had been paid for many months thereafter. She did not sign or acknowledge the satisfaction piece, nor did she know anything about it. When the defendant's fraud was discovered, he fled the jurisdiction, the indictment for forgery having been found on December 21, 1904, and he did not return until the summer of 1907, when he surrendered himself under an agreement, as it appears, that he should not be indicted for · grand larceny. The defendant admitted upon the witness stand that he signed with his own hand the signature "Julia A. Smith" to the satisfaction of the mortgage. His testimony is as follows:

"I signed the satisfaction piece which has been introduced in evidence here on the part of the state. I believe I signed it about March 14, 1904. I called Miss Smith up on the phone. Mr. Silverberg was then in my office, and I spoke to her and told her that the paper was signed by me, or was to be signed, and told her to tell Silverberg that it was all right for me to sign it. Mr. Silverberg did go to the phone. After Silverberg spoke over the phone, I gave the paper into Mr. Silverberg's hands, and my recollection is that he then and there signed it once or twice, twice I believe. It was signed in my office on my desk."

Under cross-examination he said:

"I recollect sending for Silverberg to come to my office in connection with the acknowledgment of the satisfaction piece. I have a very clear recollection of that. I sent for him to J. Wallach's Sons cigar store on Fourteenth street, either by telephone or by leaving word there for him."

Silverberg, the notary, who took this acknowledgment, testified: That he knew Miss Julia A. Smith; that the first time that he saw her was at the district attorney's office in 1904; that she did not acknowledge to him that the name Julia A. Smith on the satisfaction of

the mortgage was executed by her; that on the day that he signed the instrument as commissioner of deeds he did not know her at all; that he did not on the 14th of March or any other day take the acknowledgment of Julia A. Smith over the telephone of Victor Shanley. On being asked where he had taken the acknowledgment, he said:

"I am not sure; I think in Fourteenth street, in a cigar store. My best recollection is that Mr. Shanley introduced me to a lady, Miss Smith, and I took her acknowledgment of the paper. I had never met that woman before, not to my recollection. Q. Was the woman Shanley introduced you to the woman now in the courtroom, Julia A. Smith? A. No, sir; this woman who signed the satisfaction piece did not sign it in my presence, but she acknowledged it."

Miss Smith positively denied that the defendant called her up on the 14th of March, 1904, and asked her to give her acknowledgment over the telephone to some person who would take the wire.

The defendant having admitted that he signed the name Julia A. Smith to the satisfaction of the mortgage, and having attempted to justify the acknowledgment by his story of a telephonic acknowledgment to Silverberg, now seeks to justify this transaction upon the ground that he was acting under a power of attorney. That power is dated and acknowledged the 4th of June, 1903, which was at the time that Miss Smith's claims upon her grandfather's estate were in process of adjustment through the North American Trust Company, and the paper reads as follows:

"Know all men by these presents that I, Julia A. Smith, at present residing at No. 202 Schermerhorn street, borough of Brooklyn, city of New York, have made, constituted and appointed, and by these presents do make, constitute and appoint Victor Shanley, of 320 Broadway, borough of Manhattan, city of New York, my true and lawful attorney for me and in my name, place and stead, to take and receive all moneys, stocks, bonds, bonds and mortgages or other certificates of indebtedness that may now or hereafter be directed to be paid to me by order of court or otherwise and that may now or hereafter be placed to my credit in the North American Trust Company of 135 Broadway, borough of Manhattan, city of New York, and to do and perform, with such money, stocks, bonds, mortgages and certificates, any and all acts that I might myself perform and to take any and all steps that he, my attorney, may deem best for the protection of my interests, and I further constitute the said Victor Shanley my attorney to sign my name and to make withdrawals and deposits in my place and stead, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever and requisite and necessary to be done in and about the premises as fully to all intents and purposes as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or his substitute shall lawfully do or cause to be done by virtue hereof. In witness whereof, I have hereunto set my hand and seal the fourth day of June, in the year one thousand nine hundred and three."

It will be seen that that paper gave the defendant authority to receive moneys, stocks, etc., "that may now or hereafter be directed to be paid to me by order of the court, or otherwise, and that may now or hereafter be placed to my credit in the North American Trust Company, * * * and to sign my name, and to make withdrawals and deposits in my place and stead," and to do all and every act and thing whatsoever requisite and necessary to be done in and about the prem-

The defendant testified about the power of attorney as follows:

"In the early part of June, 1903, we thought that Miss Smith's grandfather's estate would be settled at any time at all. Miss Smith generally went away for the summer, and at that time she was about to go to Elmira to visit my sister-in-law. I said to her, 'Julia, if you go a distance away, I may have to sign some papers for you, and it will necessitate your returning from Elmira unless you give me a power of attorney.' She said, 'All right, you can have a power of attorney,' and I prepared one. After the power of attorney was given me by Julia A. Smith, I did not do anything with it at that time. That was previous to the time the Smith estate was settled. I went down to the North American Trust Company in reference to the settlement, and, talking the matter over with them, I told them I had a power of attorney and wanted to know if that would be sufficient for them, or authority for them to deliver the estate to me. They said 'No,' they would rather have Miss Smith come personally. After the settlement of the estate, I received a communication from the North American Trust Company that there were some dividends there that had accrued subsequent to the settlement of the estate, and while the stock certificates were still in the name of the North American Trust Company, before they were transferred to Miss Smith's name, I went down to see them about that. I saw Mr. Holton then. He told me that he thought that my connection with the estate ceased at the time of the settlement. I said, 'I have a power of attorney,' or, 'I have authority from Miss Smith to collect all her dividends and deposit them for her.' Mr. Holton took the power of attorney from his desk, and I received then the checks for which they had written me about. I left that power of attorney some time after July 25, 1903, I couldn't say just what date I left it then, with the trust company. I didn't see the power of attorney again until just previous to my last trial, some time, I should say, in February of this year."

Under cross-examination:

"No one at the trust company had told me at that time that it was necessary to get a power of attorney. I thought it was necessary to get a power of attorney from Julia A. Smith because she always went away from the city during the summer months. The procurement of this power of attorney was for the purpose of enabling me to receive the physical custody of her share of the property from the North American Trust Company. Before I drew this power of attorney, I intended drawing a power of attorney to use after the estate had been distributed to Miss Smith. Q. So you had two purposes in drawing this power of attorney, viz., to get the property, and then authority to act in connection with it thereafter? A. It was to do everything that I should do for her in connection with her affairs, yes. Q. You intended to have this instrument in order that in the future you should act under it? A. That I could act for her, yes. Q. If you proposed to act in the future under that power of attorney, and by virtue of it, why did you leave it with my client's papers in the North American Trust Company, instead of retaining it, or at least a copy of it, to show your authority? A. I did not leave it with my client's papers in the North American Trust Company. I filed it with the North American Trust Company to obtain the dividends that she was entitled to. I filed it after I had received word from the trust company that dividends had accrued on stock certificates then owned by Miss Smith, but which were in the name of the trust company and had not been transferred to the name of Miss Smith."

Then referring to the acknowledgment of the satisfaction of the mortgage, he gave this testimony:

"Q. Was there any reason why Julia A. Smith should not be summoned to your office to execute the satisfaction piece herself? A. There was no reason. Q. Why did not you send for her? A. I did telephone to her. I told her, I don't recollect that I told her to come to the office. I don't recollect that I did not. I recollect telling Miss Smith at the time the mortgage was to be paid off, I last saw her before I put her name on this satisfaction piece somewhere around the 9th or 10th of the month. I had been at her house. I knew

where she lived. She had a telephone. So far as I knew she was in good bodily health, and able to sign her own name. I did not tell the Ritters or their attorney that I held a power of attorney from Julia A. Smith 'to execute the satisfaction piece. Q. Did you intimate to them in any way that you were the attorney in fact of Miss Smith? A. No. Q. Had you placed on file in the county clerk's office a copy or the original of your power of attorney from her? A. No, sir. Q. Had you secured from the North American Trust Company the paper which you say she had executed a year before, and which you said you had left with the North American Trust Company? A. No, sir; it was still there. Q. Did you intend the Ritters or Bitterman or the persons from whom you procured the $25,000 to believe that Julia A. Smith had executed that satisfaction piece in person? A. No. I did not say or do anything which would lead them to believe otherwise. Q. Was there anything upon the instrument to indicate that any person other than Julia A. Smith had signed that document? A. No, sir; I contend that Julia A. Smith executed that satisfaction piece. I did not intend to deceive the Ritters or Bitterman. Q. Was there anything to prevent you signing the name Julia A. Smith, by Victor Shanley, attorney in fact? A. There was. The fact that the power of attorney was not on file in the register's office, and this was a matter affecting real property. Q. If you could sign as an attorney at all, why did that prevent you so stating on the instrument? You did sign it as attorney, did you not? A. Yes. Q. If you did sign it as attorney, what was there to prevent you so indicating on the instrument? A. Because I believed that the power of attorney should have been on file in the register's office if I was to sign this satisfaction piece that way. I did not intend to perpetrate a fraud on the Ritters and Bitterman and make them believe it was not the act of an attorney but of the woman herself. Q. How do you reconcile? A. I reconcile it because I went over there with the intention of conducting Miss Smith's business for her, and I had no intention of defrauding Mr. Bitterman or Ritter or anybody else, and I did that act for her and in her place. Q. Do you say, as an attorney, you knew, in order to execute this as attorney in fact, your power should have been on file? A. No, because I believed under the power of attorney I have a right to sign it just the way I did. I do not know that I should be compelled to, or am compelled to, sign by attorney in fact under any power of attorney that I have. Q. Did Julia A. Smith sign that document? A. Julia A. Smith signed that paper by the authority she gave me. Q. Is there anything on that paper to indicate that you or she signed it? A. It indicates that Julia A. Smith signed the paper. Q. Does she personally acknowledge that she executed it? A. Yes, sir. Q. And she did? A. Yes, sir; I mean I called Miss Smith up on the telephone the day this paper was executed, and that it was necessary for her to get up out of bed to come to the phone, and George Silverberg spoke to her on the phone in reference to the execution of this paper. Miss Smith acknowledged to Mr. Silverberg over the phone that that was her own, not that she put the pen on the paper, but that I had signed it and I had the authority to do it."

So that the defendant claims that the instrument which is claimed to be forged, and for the uttering of which he has been convicted, cannot be in law a forged paper because on June 4, 1903, Miss Smith executed and acknowledged a power of attorney to him to receive certain securities from the North American Trust Company, to make withdrawals and deposits from said trust company in her place and stead, and to sign her name, and do all and every act requisite and necessary in and about the premises, which power of attorney was filed with said trust company, and on the faith of which said trust company paid to him certain dividends accruing on her stock, and that, having this authority to sign, he was duly authorized by her to sign her name to a satisfaction of a mortgage on the 14th of March, 1904, and to procure the acknowledgment thereof, and upon the strength of it to receive $25,000 belonging to her, and that although

the paper was signed by him with her name, and purported to be personally acknowledged by her, yet, nevertheless, it was not a forged instrument.

Whatever authority may have been conferred by that power of attorney, it certainly did not authorize the execution and acknowledgment of the instrument set up in the indictment. That instrument, upon its face, was a forgery; upon its face it purported to bear the signature of Julia A. Smith, and that she had personally acknowledged it before the commissioner of deeds. As it is conceded that she did not sign it, and as the evidence establishes that she did not appear personally before the notary and acknowledge the same, the people established in the first instance that it was a forged instrument. The burden of explanation then fell upon the defendant, who undertook to explain de hors the instrument that it had been executed by authority, and therefore he was not guilty of forgery.

The learned trial court submitted the questions in a charge extremely favorable to the defendant. Among other things, and at the request of the defendant, he charged:

"If the jury find that the defendant believed that he had legal authority to sign the name of Julia A. Smith to the instrument in question, then his act is not forgery. If the jury find that the defendant abused the authority conferred upon him by Julia A. Smith, such abuse of authority does not constitute forgery, even though it may under such circumstances constitute fraud. In determining the power and authority of the defendant in respect to the business intrusted to him by the complainant, the jury is not bound to consider the power of attorney alone, but may also consider the manner in which the parties actually conducted their business and the manner in which they customarily acted toward each other, as well as the practice they had of collecting the income and depositing the same, and also all circumstances in connection. If the jury find that the defendant executed the satisfaction piece believing that the power of attorney conferred upon him the right to do so, then he must be acquitted, even if the jury are convinced that he subsequently or at a later time appropriated the money received therefor to himself. If the jury find that Julia A. Smith executed the power of attorney introduced in evidence, and that the defendant signed her name thereto pursuant to such authority, or with the belief that it conferred upon him the authority to do so, then the defendant must be acquitted. If the defendant was mistaken in his belief that the power of attorney conferred such authority upon him, then the defendant, notwithstanding such mistake, is entitled to an acquittal. Whether the defendant was right in assuming that the power of attorney conferred upon him the right to sign the satisfaction piece in the manner he did does not necessarily have to be established; if he believed he was right, and signed the satisfaction piece in the belief of his legal authority to do so, then there was no criminal intent, and the defendant cannot be convicted of the crime charged. A person may delegate their right to sign their name to any instrument to a third party by executing in writing their power so to do, and delivering that power. Whether this 'power of attorney,' so called, conferred the authority and power upon the defendant in the case is for you to determine from all the facts and circumstances surrounding this case. If it did, acquit this defendant. If you entertain a reasonable doubt, give the defendant the benefit of that doubt, and if not, and the defendant yet believed honestly that he had the right and the power so to execute this instrument, acquit him, because there is no guilty intent proved in that event."

So that the learned trial court left to the jury to say, as a matter of fact, upon the evidence, whether the power of attorney was intended to and did authorize the making and delivering of the instrument set forth in the indictment and whether he acted thereunder; and, sec-

ondly,. that even if it did not, did the defendant believe that he was entitled to execute the instrument as he did by virtue of that power, and that if they should find in his favor upon either proposition they must. acquit?

It was a question of fact, under the circumstances of this case, whether the defendant did act under this power of attorney, irrespective of the question whether as matter of law it conferred upon him authority to do what he did do; and as matter of law, in my opinion, said power of attorney was not authority for the execution and delivery of the satisfaction of the mortgage and the acknowledgment thereto set forth in the indictment. The whole instrument was a forgery. It purported to be what it was not, viz., the personal act of Julia A. Smith in both signing and appearing personally before the notary and acknowledging her signature to an instrument which affected real estate. One of the definitions of "forgery" approved in People v. Filkin, 83 App. Div., at page 597, 82 N. Y. Supp., at page 21, affirmed on the opinion below, 176 N. Y. 548, 68 N. E. 1120, Mr. Justice Hiscock, writing, was, "the false making of an instrument which purports to be that which it is not." This language of the opinion well applies to the case at bar:

"Within these definitions, and others which might be cited, we think: That the defendant committed forgery; that he made and uttered a false instrument which was an imitation, and not what it purported to be, and which, if genuine, upon its face created a legal liability; and that he did this with the design to cheat and defraud."

We have carefully examined the record and.find no errors therein sufficient to disturb the judgment. The rights of the defendant were carefully guarded, he had a fair trial, and the verdict of the jury is fully sustained by the evidence.

The judgment appealed from is affirmed. All concur.